Opinion delivered June 15, 1887.

------

No. 5539.

ELIJAH McCULLOUGH *v.* THE STATE.

1. MURDER—REASONABLE DOUBT.—CHARGE OF THE COURT with respect to the reasonable doubt is sufficient if it applies the doctrine to the whole of the case, though not to each and every contested question arising upon the evidence.

2. SAME—EVIDENCE.—See the opinion for evidence *held* inadmissible upon the main issue or as corroborative evidence, because of immateriality, and inadmissible as impeaching testimony because of the want of predicate; and, therefore, to have been properly excluded.

3. SAME—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

APPEAL from the District Court of Limestone. Tried below before the Hon. S. R. Frost.

The appellant in this case was convicted in the first degree, and as punishment, awarded a life term in the penitentiary, for the murder of Jerry Green, in Limestone county, Texas, on the twenty-second day of June, 1883.

Lucy Green, the widow of the deceased, was the first witness for the State. She testified in substance that, in June, 1883, when the deceased was killed, she and the deceased were living on Doctor McCain's farm, in Limestone county, Texas. The deceased and the defendant at that time were cropping together. The house occupied by the witness was a single room structure, situated on the east side of the road. There was a door in the north and one in the west sides. The chimney was on the east side, and on the same side and a little south of the chimney, there was a small window. A short time before the twenty-second day of said June, the deceased and the defendant had some unfriendly words about a plow. The deceased asked the defendant, who was to provide the farming implements, for a plow fit for service, and the defendant refused to provide it. An uneventful quarrel ensued. On another occasion, that day being Sunday, the fence around the farm was found to be out of repair at one place, and the defendant demanded that deceased send his wife, the witness, help to repair it, remarking that he had his woman at field work, and deceased might as well have his at it. Deceased replied that his wife worked enough during the week, and should not be put to work on Sunday; whereupon a quarrel ensued between defendant and deceased.

On the evening of June 22, 1883, the defendant came to witness and asked where her husband was. She replied that he was in the house, cooking supper—the witness, who was then sitting in the north door, being unwell. Thereupon the defendant turned, went around the south side of the house to the east end, near which the deceased had tied a steer furnished him by the defendant, and which he intended to work the next day. When the defendant reached that point he called to deceased to come out there; that he wanted to see how his steer was being treated. He then stepped into the corner made by the house and chimney, on the south side of the chimney. Deceased stepped out of the north door and went east around the house to the east end. When he reached the east end, the defendant stepped from his place of concealment behind the chimney, and shot him. Deceased ran up the road into the cotton patch, followed by the defendant, who set the dogs on him. The dogs chased but would not seize the deceased. Defendant called to his son Dave, then at work west of the house, to bring him his horse. Deceased said nothing heard by the witness except "Lord have mercy! Lord have mercy!"—exclamations he made as he ran past the

witness, who was in the north door. Deceased fell near an old house in the cotton patch, about two hundred yards from where he was shot.

Defendant came to the deceased's house, just before the shooting, from a south direction in which there were some houses or "quarters" situated. . Witness saw him before he reached the house, but did not see his gun. She saw that he had something carried perpendicular with his leg, and took it to be a stick. She did not see him when he raised the gun to shoot, but she saw him when, just after he called deceased, he stepped into the corner made by the side of the house and the chimney. She saw him take that position, through the little window south of the chimney, the shutter to which was incompletely closed. Witness was looking through a crack in the house when she saw the defendant pursuing the deceased. Defendant had on an overcoat. Deceased had no arms of any kind on his person when he went out of the house in response to the defendant's call. After the shot was fired, and the witness thought it safe enough, she ran over to the house of old man John Jackson. Isaiah and Bob Foster soon came to Jackson's house, hunting for witness, and they, with witness and John Jackson, went back to witness's house, and found Ephriam Foster caring for deceased, who was lying on the floor hallooing. The deceased was shot in the breast, and lived four days. His breast was shot full of little holes. There were a few weeds growing on the roadside near the house. The witness had not seen the defendant or his son Dave on that evening prior to the shooting. The witness closed her testimony in chief by identifying as correct the following diagram introduced by the State:

[See diagram on opposite page.]

Statement of the case.

Cross examined, the witness stated that the defendant was coming toward her when she first saw him. She saw him before she saw his son Dave or his dogs. She denied that when she first saw the defendant he was standing in the weeds on the roadside, west of the house, and that, at that same time, she saw Dave standing in the oat patch. The witness testified before the coroner on the inquest over her husband's body, that she had no recollection of stating in her testimony on that occasion that when she first saw defendant he was standing in the weeds, and that she then saw the boys and the dogs in the oat patch. No words passed between the defendant and the deceased after the latter stepped out of the house. When the defendant got to the house he bade the witness good evening and asked where her husband was. He did not, at the time he fired the fatal shot, say to the deceased: "Don't you run on me with that knife; if you do I will shoot your G—d d—d heart out!" It was not true that, after the shot was fired and the deceased started in flight, the dogs started in pursuit of him, and that the defendant called them back. On the contrary, he urged them on by calling to them: "Seek 'im! seek 'im!" At that time Dave was shocking oats about two hundred yards distant from witness's house. The conversation or quarrel between defendant and deceased about the plow, alluded to by the witness in her testimony in chief, occurred a few days before the shooting, in the field, and not at witness's house. Witness knew of no conversation or quarrel between defendant and deceased, about a plow, which transpired at the house. When the defendant went to the deceased in the field, on the day of the quarrel about the plow, the deceased was plowing with a dull plow, and he told the defendant he wanted a sharp one. It was refused, and the angry words followed. If deceased had ever broken a plow point, the witness had never heard of it.

On the Sunday when the defendant and deceased had harsh words about the refusal of the latter to send the witness to help repair the fence, the cows had invaded the field. Defendant got angry because deceased would not send witness to help expel the cattle and repair the fence. Ephriam Foster helped defendant drive the cattle out of the field and repair the fence. The defendant was standing south of and near the chimney when, just before the shooting, he called to deceased to come out of the house. Immediately upon calling he stepped into the chimney corner. Witness saw him step to the chimney corner through

an opening left by the partially closed window shutter. His form darkening that opening first attracted her attention. Defendant's habit, prior to that evening, had been to come to the house direct, and the witness, at the time, thought strange that he should approach the house as he did, and go to the east end before calling deceased. Defendant did not fire from the chimney corner, but stepped from it and fired just as the deceased reached the point opposite. The Sunday quarrel about the fence was settled by the interposition of Doctor McCain. The witness married the deceased in Robertson county, two years before his death. If he was ever in Grimes county witness did not know it. The shooting occurred about sundown. The deceased had been home from Mexia about three hours. Defendant was a much larger and stronger man than deceased. The weather was warm for an overcoat. Witness's baby was in her arms, nursing, when defendant got to the house, and at the time of the shooting.

Ephraim Foster was the next witness for the State. He testified that he had known the defendant pretty much all of his life, and had known deceased about three months at the time of the shooting. The shooting occurred on the evening of June 22, 1883. About eight o'clock on that evening a man rode up to witness's gate and called. Witness's boys came into the house and told witness that the defendant was outside and wanted to see him. Witness sent him word to come in. He sent word back to witness that he wanted to see him outside. Witness went out and found defendant astride a bald faced horse, armed with a gun. He appeared about as composed as usual, and displayed no excitement. He first handed witness a plug of tobacco to repay one he had previously borrowed, and then said that Jerry Green had suddenly taken sick, and had fallen in the field, and that he would give witness's boys, Isaiah and Bob, a dollar each if they would go to the field and take him up. Witness directed his boys to go and attend to the sick man. Defendant said nothing about a difficulty. Isaiah and Bob went to Allison Pierson's house to get help, but returned to witness's house and refused to go to deceased's field unless witness went with them. Witness then got on his horse and went with his boys, who walked. Reaching the deceased's house and finding it dark, one of the boys, by witness's direction, hallooed. Somebody, witness then thought a woman, answered, but witness did not distinguish what was said. A voice which the witness

identified as the voice of deceased, then asked: "Who is there?" Witness answered: "Ephriam Foster." Deceased then asked: "Where is Uncle Ephriam Foster?" Witness, who was sitting on his horse outside, replied: "Out here!" Green said: "Tell Uncle Ephriam to come in here and help me." Isaiah then said that he heard groaning inside the house. About that time the deceased, drawn up and bent over, came to and opened the door, and immediately fell and went to hallooing with all his power. Witness, still ignorant of deceased's condition, but thinking he might be suffering from cramp, directed Isaiah to go for Doctor McCain. Isaiah went off. Witness remained all night, but the doctor did not come during that night. A considerable time elapsed before the witness found out what was really the matter with Green. Deceased finally made a statement and witness sent to John Jackson's, to Berry's and to Taylor Wright's houses, and soon the deceased's house was full of people. Deceased asked the witness what he thought of his case. Witness replied that he did not know. Deceased then said that he thought it was the last of Jerry Green, and that he wanted to go to heaven. Witness advised him that if such was his condition he had better go to praying. John Jackson, Berry and Lucy Green, bearing lights, were the first parties to reach the house after the arrival of witness and his boys. Doctor McCain did not get there until between eight and nine o'clock on the next day. Deceased was shot in the breast, but the witness did not examine his wounds. He did not examine the ground about the doors, window or chimney, nor elsewhere about the place.

Cross examined, the witness stated that, on the morning of the fatal day, the deceased, going towards Mexia, stopped in front of witness's house, but witness did not speak to him, as he was inside. While deceased was there, defendant drove up in his wagon, and called to witness to go with him to Mexia. Witness replied that he could not go. Defendant, riding in his wagon, and the deceased, walking behind, left witness's house about the same time, going towards Mexia, The witness did not see Isaiah give Green anything at the house, and knew that Isaiah did not give deceased anything, because the two, Isaiah and deceased, were not near enough together while deceased was at witness's house for anything to pass from one to the other. The witness remembered the Sunday of the storm, when the fence about Doctor McCain's farm (on which the joint fields of defendant and deceased was situated) was blown down.

Witness went there with defendant and helped put up the fence. When deceased came down to the fallen fence, defendant said to him: "I put you here to see over the place, and now the fence is blown down, and you are sitting in the house!" Deceased replied: "Well, you promised to pay me for what I did, and you have not done it." Defendant retorted: "I only promised to pay you for the work you done." At that time deceased was immediately behind witness, at witness's gap, about fifty yards distant from defendant's gap. The two, defendant and deceased, were then hallooing at each other. Deceased then had on no shirt. He had no knife or other weapon that the witness saw. The defendant and deceased were talking to each other when they left witness's house on the morning of the fatal day, going towards Mexia, but witness did nor hear what they said. Witness did not follow deceased and have a talk with him. Witness went into his field to hunt a sow some time after defendant and deceased passed the house, but did not, while gone, meet deceased on the branch and have a talk with him. There was an oat patch belonging to defendant near and west of deceased house, but it did not extend to the south side of that house. Deceased's wife was not in the field on Sunday at the time of the quarrel between deceased and defendant about the fence. She stayed at the house, seventy or eighty yards off.

Re-examined, witness stated that the row in the field on Sunday occurred about two weeks before the homicide. Doctor McCain was not in the field at the time, but came afterwards. Deceased and defendant were not nearer together than seventy or eighty yards at any time during their quarrel. Deceased then had a pair of pants, but witness could not say that the pants had or had not a hip pocket; at all events he saw no pistol or other weapon on the person of the deceased. Witness paid but little attention to the words which passed between defendant and deceased, and could not repeat them. The weapon carried by defendant, when he came to witness's house on the night of the homicide, was a double barreled shot gun.

Doctor Lewis testified, for the State, that the gun shot wound in the breast caused the death of deceased.

Isaiah Foster was the next witness for the State. He testified that he had known the deceased but a short time at the date of the latter's death. On the morning of the day of that occurrence the defendant and deceased came by the house of Ephraim Foster, witness's father, going towards Mexia. They got to the

house about the same time, remained about the same length of time—about five minutes—and went on. Witness saw defendant on his way home, about thirty minutes before sunset on that day, but did not see deceased until night. Defendant was in his wagon, both going and coming from Mexia, and if he had a gun or other weapon with him witness did not see it. Witness's father, with whom witness lived, lived between the houses of defendant and deceased, about two hundred and fifty yards from defendant's house, and about one and a half miles from deceased's. Not long after defendant passed, going home, witness heard a gun fired twice at the house of defendant, and within fifteen minutes he saw the defendant, armed with a double barreled shot gun, going toward's deceased's house. Defendant was then on foot. Some time afterwards he returned on horseback with his son Dave riding behind him. He then had his double barreled shot gun. The remainder of this witness's testimony in chief conformed to the testimony of his father as to the subsequent events of that night.

Cross examined, the witness stated that he did not hear the discharge of a gun at the house of the deceased on that evening or night. He denied positively that he gave anything to the deceased as he, deceased, passed his father's house going toward Mexia on that morning. Witness had no pistol on that day or night, nor until at least a year afterward, when he purchased one. Witness had never talked with either defendant or deceased about the difficulty between them. He had heard his father speak of ill feeling existing between defendant and deceased. There was no pistol on deceased when witness reached him, after he was shot.

Z. T. Wright testified, for the State, that on the night of June 22, 1883, news was brought to him at his house, by Isaiah Foster and Allison Pierson, of the shooting of the deceased. Witness went to the deceased's house on the next morning and found deceased suffering from a gun shot wound in the breast. He thought the wound was made with mixed small shot. The bulk of the shot struck the left shoulder, but some scattered over the left arm. Deceased said that he was bound to die, and made a statement to the witness as to how the shooting occurred. At this point the State offered to prove the dying declarations of the deceased, but, upon objection by defendant and proof that the deceased had served a term in the penitentiary under a conviction of felony, in Grimes county, the dying declaration was excluded.

John Jackson testified, for the State, that deceased came to his house on the Tuesday before the Thursday he was shot, and asked for some onions for his sick wife, and to borrow a plow, saying that his plow was worthless. Lucy Green, deceased's wife, came to witness's house on the night of the shooting. She had her baby with her and appeared to be much excited and frightened. Isaiah and Bob Foster soon afterward came to witness's house, and went home with Lucy. There was an oat patch on the west side of the place then occupied by the deceased, but none on the south side. The gate was south of the house. There was no oat patch between the gate and house, nor on the east side where the chimney was.

James Anderson testified, for the State, that he was one of the jury of inquest over Jerry Green's body, and examined the premises occupied by deceased when shot. He described the construction of the house as it was described by Lucy Green in her testimony, and said that one sitting in the north door could readily look through a crack or crevice at the window and see a person step into the chimney corner from a point south of it.

The State closed.

The defense first read in evidence the testimony of Lucy Green, the wife of the deceased, as it was reduced to writing on the inquest over the body of deceased. It reads as follows:

"I am the wife of the deceased. Ephraim Foster sat up with my husband from about six to twelve o'clock at night on the second day of July, 1883. He gave him morphine during the night, and a dose of pills at bed time. All the medicine given him was dosed out by Doctors McCain and Lewis. My husband seemed to get worse directly after dinner. Chilly Jackson, Isaiah Foster, Allison Pierson and Milly Leonard sat up with my husband from twelve o'clock until morning, when he died, which was about seven or eight oclock. I know that they did sit up with him, for I was awake and saw them. About sundown I saw Lige McCullough standing in the chimney corner of my house, and he called to my husband to come out; he wanted to see how he was treating his ox. My husband came around the opposite corner of the house, and McCullough shot him without saying anything to him. My husband then turned and ran across the field, and McCullough took after him, with his gun in his hand, and set the dogs on him. I ran off immediately, and did not come back until about eight or nine o'clock that night, and found my husband at home leaning up against the bedding. This all

occurred on the twenty-eighth day of June, 1883. That evening
I saw Lige McCullough's boy in the oat patch near my house,
with the dogs, and his father standing in the weeds, close to the
house. He spoke to me as he went around the house."

Dave McCullough, the defendant's son, was the first witness
placed on the stand by the defense. He testified that he was
twelve years old at the time of Jerry Green's death. Defendant
went to Mexia on the day that Green was shot, and got home
between three and four o'clock. Witness met him in the road
on his way home, and again saw him at the house. Later in
the evening he came to the oat patch near deceased's house,
where the witness was at work. He came on foot. Witness
had a horse at the oat patch. This was about an hour before
Jerry was shot. Defendant had his gun with him. He brought
his gun with him to aid in getting some hogs out of the field.
His purpose was to kill a wild barrow with long tushes that led
the flock, and get the others out with the dogs. The defendant
went up to Jerry's house, spoke to his wife, Lucy, and asked
where Jerry was. Lucy spoke to Jerry in the house and said:
"Jerry, Mr. McCullough is out here and wants to speak to you."
Jerry replied: "By God! I don't want to see him!" The defend-
ant then walked off towards the railroad, and asked Jerry:
"What have you got this steer tied here for?" Presently Jerry
ran out of the house, and witness heard the defendant say:
"Stop, Green; don't you run on me with that knife." The gun
then fired, and Jerry ran off two hundred or three hundred
yards and sat down. Defendant then called to witness for his
horse. He rode up to Jerry and talked to him for a while. He
then came back to witness, took witness up behind him, and
went home. He stopped at Ephraim Foster's house and gave
Ephraim a plug of tobacco to repay one he had borrowed. He
told Ephraim that Jerry was in the field sick from a shot, and
that he wanted the boys to go there and attend to him, for which
he would pay two dollars. Ephraim replied that the boys were
going to a wedding and could not go.

Cross examined, the witness stated that the reason he did not
tell everything he knew about the transaction, on the inquest,
was because he was directed to answer questions, and, in ac-
cordance with that direction, he answered only such questions
as were asked him. The witness did not see the hogs in the field
on the day of the shooting, but he did on the day before. Ephraim
had promised to help witness drive the hogs out of the field on

that evening, and witness took his dogs along to use in driving them out. It was not dark when the defendant and witness got to Ephraim's house after the shooting. Witness had been in the oat patch about an hour when the defendant came there. He told the witness to take the horse, and that he would walk on down the railroad, and they would drive the hogs out. He went direct from the witness in the oat patch to Jerry's house. Defendant spoke to Lucy in his ordinary tone of voice. Witness could not hear distinctly after defendant and Jerry got behind the house. Lucy was sitting in the north door, and defendant and deceased went around the house in opposite directions, meeting each other. Jerry had one hand down by his side, and the other in his pocket. Witness was walking away from the direction of the house when defendant called to Jerry not to run on him with the knife. Witness had finished shocking oats, and was within ten steps of the house when the defendant reached the house. The gun fired before the witness got the horse bridled. Defendant talked to Lucy Green about two minutes; then walked about ten steps south and then east, and then witness heard the call to Jerry not to run on him with the knife. The whole transaction did not cover over five minutes of time. It was not sundown when defendant and witness left Green's house. The wild barrow had killed one of defendant's dogs in the spring, and the gun was brought to the field to kill the barrow if he could not be driven out by the dogs. Defendant did not set the dogs on Green after shooting him and while Green was running. The dogs did not follow or run after Green.

Doctor McCain testified, for the defense, that he lived in Mexia in 1883. Defendant was a renter on witness's farm in June of that year. In consequence of a note received from defendant, witness went out to his farm a few days before the shooting, and saw both defendant and deceased, but not together. Defendant came to witness's house on the night of the shooting, and reported the shooting of Green, and asked witness to go out and attend him. Witness did not go that night, as it was five miles out, but went next day. Witness advised defendant to go home, and he did so. Defendant was at deceased's house on the next day while witness was there. Deceased was shot in the breast with what appeared to witness to be squirrel shot. When shot, the deceased's left shoulder was evidently thrown forward towards the man who shot him.

Cross examined, witness stated that defendant rented the farm from him, and usually consulted him about the place as well as about other things.   Deceased was a sub-renter under defendant. Jerry Green died from the effects of the gun shot wound.   Witness generally used a rifle to kill hogs, and did not think squirrel shot would be very effective for such service; nor did he think squirrel shot could be relied upon to kill a man, though they might cause death at a distance of twenty or thirty yards, if they penetrated the bowels or other vital part.

John Beane testified, for the defense, that he saw the deceased on the twenty-sixth day of May prior to his death.   He was then armed with a pistol.

Dave Johnson, the nephew of the defendant, testified, for the defense, that he saw the deceased, on the morning of the killing, within a few yards of defendant's house.   Witness told deceased, in reply to deceased's question, that he was not at work because he was sick.   Deceased asked where the defendant was.   Witness replied that he was in the house, and deceased asked witness to tell defendant to come out.   Witness declined, and deceased said, and repeated:  "By God, I will see him before night!"   He then turned and went off across the field, and witness saw the black handle of a pistol protruding from his hip pocket.   He was in his shirt sleeves.   The witness, his mother, Jane Mitchell and the children, at about an hour by sun on the same evening, were near defendant's house, setting out potatoes, and witness then saw deceased again.   He said to witness: "By God, I thought you were sick."   Witness replied that he was sick.   Witness, who was then stooping down, did not get up, and could not say that deceased still had the pistol.

Jane Mitchell, testifying for the defense, stated that she was with Dave Johnson in the field on the evening of the killing. She was near, and heard deceased say to Johnson:  "I thought you were sick this morning?"   Johnson replied that he was sick. Deceased said:  "It don't look much like it now."   The witness distinctly saw the handle of a pistol protruding from his hip pocket.

Ephraim Foster, recalled, testified, for the defense, that a very large and dangerous hog, with long tushes, frequented defendant's field, and that, some time prior to the shooting of Green, witness and defendant had agreed to get that hog out of the field, and expected to have to kill him.   The hog killed one of

defendant's dogs some time before.    They set no particular time for the attack on the hog.

Ex-District Clerk W. T. Jackson was introduced by the defense, examined the transcript of the proceedings upon the coroner's inquest, and declared that it was written by Mr. Etheredge, who took the testimony down.    Etheredge was a remarkably rapid scribe, but a very inaccurate copyist.    His errors generally resulted from his effort to remember and transcribe three or four lines at a time.    He often omitted or inserted words that would materially change the sense of the document copied.

A large number of witnesses, introduced by the defense, testified that they had known defendant for many years, and that he had always borne a good reputation for peace and quietude. He was considered by some to be somewhat overbearing and dictatorial to negroes in his employ, but not to the extent that he would do violence or murder in enforcing his authority.

The defense closed.

Doctor McCain testified, for the State, in rebuttal, that he saw deceased in Mexia on the day of the killing.    Deceased made no threats against defendant, but said that defendant would not furnish him a plow line.    He gave, as the defendant's reason, that defendant had furnished a yoke of oxen and wished him to plow them together, and had furnished him a single line which was enough for that purpose, but that he, deceased, wanted to run two plows and plow the oxen single.    Witness gave deceased a plow line.

Z. T. Wright testified, for the State, in rebuttal, that defendant was generally reputed to be a man who was exceedingly overbearing with his employes, making them do just as he pleased. In this respect this witness was corroborated by other witnesses introduced by the State in rebuttal.

On his cross examination, the witness Wright admitted that he had a misunderstanding with defendant, four or five years ago, that resulted in nothing but a suspension of good feeling. He had no especial bad will towards defendant, and, in assisting the prosecution in this case was doing only what he thought was right.

As matter in rebuttal, the State then introduced in evidence the written testimony of Dave McCullough, the son of defendant, taken before the coroner's inquest.    It reads as follows:

"I am twelve years old.    On June 28, last, I was on Doctor McCain's farm, shocking oats.    It was about three or four

o'clock. I was there until about dusk. I left there then with my father. He came up there (to the house) about four o'clock. He had a shot gun. I was about one hundred yards from Jerry Green's house. I saw my father go toward that house between four and five o'clock. The sun was then about two hours high. Did not see him go towards Green's more than the one time. I heard some shooting down about Green's house about twenty minutes after my father went there. I saw Green before I next saw my father. He was running. That was after the shooting. He had his hand at his side, but nothing was in it. He was running away from the house. He made no fuss, nor did he halloo. My father was then standing something about east of the house. I had a dog with me and carried him up to the house when he called me. He was then at the north end of the house, two hundred yards from the house. He told me to bring the horse to him, as he wanted to go home. I carried the horse to him in the field. He was then over one hundred yards from Green's house. Before we got out of the field, I got on the horse behind my father, and we went on home. I saw nothing more of Green after I carried the horse to my father. We got home before dark. We went direct home from Jerry Green's house. We stopped at Mr. Foster's house. My father called Ephraim Foster out and paid him some tobacco he had previously borrowed. He then told Ephraim that there was a man up there sick from a shot. He did not tell Foster who shot him. He said nothing to me about the shooting. He told Isaiah Foster he would pay him if he would go up there and put the man in the house. Father did not say what was the cause of the shooting, but he said that he wanted us children to keep on working. Foster did not ask father if he had had a difficulty with any one."

The motion for new trial raised the questions discussed in the opinion.

*Burrow & Kincaid,* for the appellant: The court had, in his charge, applied the reasonable doubt (which was proper) to the question of express malice, and the distinction between murder in the first and second degrees, and refused to apply it to the question of self defense, and the jury doubtless concluded that it was inapplicable. It is true that the court gave in charge the general doctrine of presumption of innocence, etc., but the jury would reason that if the court intended for this to apply to all

questions in the case why did he apply it specially in the other instances? Now, there is no question but that if the jury had a reasonable doubt as to whether defendant was justifiable in self defense, it would be their duty to acquit; and it occurs to counsel that defendant would have the right to have them told so in plain words, without leaving them to resort to construction to find it out.

There was but one issue presented by the defense in this case, and that was self defense, and there being nothing else to which the doubt charged generally by the court could apply, the difference between murder in the first and second degree having been covered by special application, it certainly would have been proper to have told them so directly. (Rockhold v. The State, 16 Texas Ct. App., 585; Black v. The State, 1 Id., 391; Robinson v. The State, 5 Id., 519; Ake v. The State, 6 Id., 399; Davis v. The State, 43 Texas, 189.)

Under the fifth assignment of error we submit the following propositions: 1. Testimony should not be excluded on a general objection unless it is inadmissible for any purpose. No one saw the deceased at the time of the shooting. Appellant had proved by Dave Johnson that deceased had a pistol in his pocket on the morning before the killing in the evening, hunting for appellant, and by Jane Mitchell that deceased had the same pistol in his pocket that afternoon. The witness Isaiah Foster, together with Ephriam and Bob Foster, were, so far as the testimony shows, the first persons to get to deceased after the shooting. Isaiah Foster had testified that he saw Green that morning, and he had no weapon of any kind. This was immediately after deceased was seen by Dave Johnson with the pistol, when he says that appellant was hitching up to go to Mexia, and that deceased split out across the field. When they got to Ephriam Foster's on the way to Mexia they were together. Isaiah Foster says that all three of us (meaning his father and Bob) went together and found the deceased had been shot. He said I had no pistol that day, that night, nor before that. He also testified that he had examined deceased after he got to him on the night of the shooting, and found no pistol upon his person, and that he had got no pistol from deceased at any time. In this state of case defendant placed the witness John Beane on the stand, and offered to prove by him that he saw deceased with a pistol on the twenty-sixth day of May, prior to his death, and that he saw this same pistol in the possession of the State's witness, Isaiah

Foster, after Green's death. The court excluded this testimony on a general objection, and defendant excepted. The shooting occurred on the twenty-eighth of June. (Pridgen v. The State, 31 Texas, 420; Russell v. The State, 11 Texas Ct. App., 288; Black v. The State, 9 Id., 328; Tyson v. The State, 14 Id., 388.)

This testimony was admissible for at least two purposes; first, to contradict the State's witness, Isaiah Foster, particularly as to his statement that he got no weapons off the body of deceased, and second, to corroborate the testimony of defendant's witnesses, David Johnson and Jane Mitchell, and it tended generally to support the defendant's testimony that the killing was in self defense.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for murder of the first degree, with the punishment of confinement for life in the penitentiary assessed. The State propounds that the case is one of murder of the first degree; defendant, that it is a homicide in self defense.

Appellant's first and second assignments of error, taken together, are that the court should have charged the reasonable doubt as to every particular matter constituting the material or principal issue in the given case. The only statement of this proposition is found in the following: "The court submitted a charge on the question of self defense, neglecting to apply the reasonable doubt," and that "defendant sought to correct the omission by a special charge, which was refused by the court."

In answer to this proposition we state: In King's case, 19 Texas Court of Appeals, 558, the rule is thus stated by a majority of the members of the court: "As to reasonable doubt, if the charge applies this to the whole case, this will satisfy the demands of the law." (See also Webb's case, Id., 490.) Rockhold's case, 16 Texas Court of Appeals, 585, is not in point.

Under the fifth assignment the following proposition is submitted: "Testimony should not be excluded on a general objection, unless it is inadmissible for any purpose." Under this proposition we condense the following statement: The State proved by several witnesses that deceased, just after the shooting, did not have a pistol. Appellant proposed to prove that deceased had a pistol on May 26 (the shooting occurring on June

28), and that Isaiah Foster had this pistol after the death of deceased.

That deceased had a pistol on May 26 has no possible bearing on this case; nor has the fact that Foster was seen with this pistol after the death of Green. We are not informed as to what time Foster was seen with the pistol, nor from whom he procured it, nor how long after Green's death, etc. Appellant insists that this proposed evidence tended to impeach Foster. For this purpose the evidence could not be used, for want of a predicate.

It was also contended that this evidence tended to corroborate Johnson and Jane Mitchell. This was not necessary, because they needed no such corroboration, the fact that Green had a pistol on the morning of the shooting being immaterial, under the facts of this case.

As has been said, this case presents two theories: murder of the first degree, and self defense. Upon each the learned judge charged the law clearly, and, we think, correctly. Counsel for appellant contend, however, that the verdict found is not warranted by the facts. We believe the evidence is amply sufficient.

The other objections, relating to the venire, we do not think necessary to discuss. The judgment is affirmed.

*Affirmed.*